IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States,<br><br>        Plaintiff,<br><br>    v.<br><br>Howard Dixon,<br><br>        Defendant. | Case No. 18-cr-00319-CRB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT HOWARD DIXON'S MOTION TO SUPPRESS** |

Defendant Howard Dixon ("Dixon") moves to suppress the evidence obtained by the San Francisco Police Department ("SFPD") during a warrantless search of an apartment, as well as a subsequent warrantless search of his vehicle and person. Amended Mem. in Support of Mot. to Suppress ("Mot.") (dkt. 10) at 3. Dixon contends that the SFPD unlawfully searched (1) the apartment, (2) his car, and (3) his person, and that the evidence obtained from all three locations should be suppressed. Id. at 4-6. Dixon alternatively requests an evidentiary hearing on (1) whether the search of Dixon's car was lawful and (2) whether the officers would have arrested Dixon for possession of marijuana even though marijuana is legal in California.

For the reasons set forth below, this Court GRANTS the motion to suppress as to the evidence obtained from the search of the apartment because the SFPD officers did not have probable cause to believe that the apartment was Dixon's residence, and DENIES the motion as to the searches of Dixon's car and person because each search is permitted by Dixon's federal supervised release agreement. Because an evidentiary hearing would be speculative at best, this Court DENIES Dixon's request for an evidentiary hearing.

## I. BACKGROUND

This motion arises out of a March 9, 2018, search of the Oakdale Apartments at 1150 Palou Avenue ("Oakdale apartments"). Mot. at 1; Opp. (dkt. 19) at 4. Officer Eduard Ochoa began surveilling Dixon two months prior to that date and made several observations of Dixon and various vehicles at or around the Oakdale apartments. Ochoa Decl. (dkt. 25) ¶¶ 8-10. Believing Dixon was a resident of the Oakdale apartments, Ochoa detained Dixon and searched Apartment K of the Oakdale apartments, Dixon's vehicle, and Dixon's person. Id. ¶¶ 15, 20-28. These searches produced substantial quantities of cocaine, heroin, methamphetamine, and marijuana. Id.; Photographs of Seized Items (dkt. 11 Ex. B). Dixon now moves to suppress the fruits of these searches. Mot. at 1.

In January of 2018, Ochoa learned that Dixon was suspected in a shooting that occurred in San Francisco's Bayview district, where the Oakdale apartments are located. Opp. at 2; Ochoa Decl. ¶ 6. Ochoa knew of Dixon and was aware that he had prior felony convictions. Id. Dixon was on supervised release as a consequence of these prior felonies. Judgment (dkt. 19 Ex. A) at 1–3. One of his supervised release conditions that this Court imposed on the grant of supervised release stated that Dixon "shall submit to a search of his person, residence, office, vehicle, or any other property under his control. Such a search shall be conducted by . . . any federal, state, or local law enforcement officer at any time with or without suspicion." Judgment at 4.

Over the course of two months, Ochoa conducted periodic surveillance of Dixon at the Oakdale Apartments. Ochoa Decl. ¶¶ 8–10. During that time, Ochoa reported observing the following: (1) On one occasion, Dixon entered Apartment K of the Oakdale apartments through the front door; (2) On two occasions, Dixon was on the landing area directly outside of Apartment K; (3) On one occasion, Dixon stood in front of the Oakdale apartments; (4) On two occasions, Dixon drove a black BMW sports car in the Bayview neighborhood; (5) On one occasion, Dixon sat inside a black BMW sports car while parked in front of the Oakdale apartments; (6) On five occasions, a black BMW sports car was parked in front of the Oakdale apartments, unoccupied; (7) On two occasions, Dixon

drove a blue Honda minivan through the Bayview neighborhood; and (8) On at least two occasions, a blue Honda minivan was parked in front of the Oakdale apartments, unoccupied.[1] Id. In addition to these observations, on three occasions Ochoa surveilled the Oakdale apartments and saw neither Dixon nor the two previously-mentioned vehicles. Id.

On March 9, 2018, prior to the search, Ochoa contacted the United States Probation Office and confirmed that Dixon was on an active grant of supervised release with a warrantless search provision. Id. ¶ 11. Ochoa did not receive any information regarding Dixon's listed address from the Probation Office, but he searched for that information on four databases: California Department of Motor Vehicles, California Law Enforcement Telecommunication System, Accurint, and FirstTwo. Id. ¶ 12. The searches of these databases produced three different addresses associated with Dixon, two in Oakland, and one in San Francisco. Id. None of the addresses listed were the Oakdale apartments. Id.

Later that day, Ochoa observed Dixon exiting the Oakdale apartments. Id. ¶ 17–18; SFPD Incident Report (dkt. 11 Ex. A) at 5. Dixon then ran back up the stairs and into one of the units in the Oakdale apartments. Id. He then exited the apartments once again, this time carrying two trash bags, and approached a blue Honda minivan parked outside. Id. Ochoa ordered several SFPD officers who were with him ("the officers") to move in to detain Dixon to conduct a search pursuant to the warrantless search condition. Ochoa Decl. ¶ 20; SFPD Incident Report at 5. When the officers approached, Dixon dropped a set of keys onto the ground. Id.

Ochoa took the keys from the ground and walked up the stairs toward Apartment K, which was on the third floor of the Oakdale apartments. Ochoa Decl. ¶ 21. Ochoa used one of the keys to unlock the front door of Apartment K. Id. He then knocked and announced the presence of the SFPD and entered the apartment. Id. The officers found

---

[1] Dixon disputes his presence in a black BMW sports car. Decl. of Howard Dixon (dkt. 28) ¶ 4. However, this Court need not determine the truth of this dispute because, even if Dixon were present in the sports car during these observations, the officers still did not have probable cause to believe that Dixon was a resident of Apartment K.

3

Tracy Shackleford inside the apartment, with whom Ochoa had spoken before. Id. ¶¶ 5, 22. Shackleford confirmed to Ochoa that Dixon had rented a bedroom in Apartment K. Id. ¶ 23. Shackleford directed the officers to Dixon's room, and Ochoa used one of the keys that Dixon had dropped to open its door. Id.

Inside the bedroom, the officers found two backpacks containing several individually-wrapped baggies of cocaine, heroin, and marijuana, as well as a digital scale and additional packaging materials. Id. ¶ 25; SFPD Incident Report at 5. The officers also found pieces of mail addressed to Dixon at the San Francisco address listed as Dixon's residence on one of the databases that Ochoa had searched. Id.

The officers then exited the Oakdale apartments and conducted a search of Dixon's person. Ochoa Decl. ¶ 26. The search revealed $897 in cash, but no drugs or drug paraphernalia. Id. The officers proceeded to search the blue Honda minivan, which Ochoa accessed using the keys that Dixon dropped. Ochoa Decl. ¶ 27; SFPD Incident Report at 5. That search revealed another backpack containing marijuana. Id. The officers then took Dixon to the Bayview Police Station ("Bayview Station"). Id.

While Dixon was sitting on a bench at the Bayview Station, an officer reported seeing Dixon "elevate his waist from the bench and move his right arm toward his buttocks area." Ochoa Decl. ¶ 28. Ochoa identified this movement as an attempt to conceal contraband. Id. The officers searched Dixon, at which time a clear bag fell from his buttocks area. Id. Ochoa examined the bag and found it to contain dozens of additional individually-wrapped baggies of cocaine, heroin, and methamphetamine. Id.

The Government filed a three-count indictment against Dixon on July 17, 2018, charging him with three counts of possession with intent to distribute a controlled substance under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Opp. at 8; Indictment (dkt. 1). Dixon now moves to suppress that evidence. Mot.

**II.   LEGAL STANDARD**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

4

1    Const. amend. IV. Although a warrant is generally required, the "touchstone" of the

2    Fourth Amendment inquiry "is always the reasonableness in all the circumstances of the

3    particular governmental invasion of a citizen's personal security." See Pennsylvania v.

4    Mimms, 434 U.S. 106, 108-09 (1977) (internal quotation marks omitted).

Police officers "may lawfully conduct searches of parolees or their residences without satisfying the Fourth Amendment's warrant requirement when certain conditions are met." United States v. Grandberry, 730 F.3d 968, 973 (9th Cir. 2013). Two such conditions are (1) "that the parolee is subject to a provision authorizing such warrantless searches," id.; see also Samson v. United States, 547 U.S. 843, 848 (2006), and (2) that "'[b]efore conducting a warrantless search' of a residence 'pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched.'" Grandberry, 730 F.3d 968, 973 (9th Cir. 2013) (quoting United States v. Howard, 447 F.3d 1257, 1262 (9th Cir. 2006) (alteration in original)).

Analytically prior to whether a search was permissible under the Fourth Amendment, however, is whether the defendant may challenge the legality of that search. "A defendant has standing to challenge the legality of a search on Fourth Amendment grounds only if he has a 'legitimate expectation of privacy' in the place searched." United States v. Zermeno, 66 F.3d 1058, 1061 (9th Cir. 1995) (quoting Rakas v. Illinois, 439 U.S. 128, 148 (1978)). To meet this requirement, the defendant bears the burden of demonstrating that he "manifest[s] a subjective expectation of privacy in the area searched, and [his] expectation [is] one that society would recognize as objectively reasonable." United States v. Sarkisian, 197 F.3d 966, 986 (9th Cir. 1999).

### III. DISCUSSION

Here, there is no dispute that Dixon was subject to a condition under his supervised release agreement that permitted warrantless searches of his home, vehicle, and person. Judgment at 4 ("The defendant [Dixon] shall submit to a search of his person, residence, office, vehicle, or any other property under his control. Such a search shall be conducted

5

by . . . any federal, state, or local law enforcement officer at any time with or without suspicion."). The Government contends that, in consequence, Dixon lacks standing to challenge the search of Apartment K, Opp. at 9-12, and that the searches of the apartment, vehicle, and Dixon's person were lawful. Id. at 12-14.

## A. The Apartment

### 1. Standing

The parties agree that, if Dixon were an overnight guest in the apartment, he would have standing to challenge the search of the apartment. See United States v. Grandberry, 730 F.3d 968, 971 (9th Cir. 2013) (holding that parolee had Fourth Amendment standing to challenge the search of an apartment in which he was an overnight guest); see Mot. at 2-3; Opp. at 11-12. Under Grandberry, then, if Dixon were an overnight guest in the apartment, he would have standing to challenge the search thereof.

But the Government contends that Dixon lived in the apartment in question. See Opp. at 1. So, it urges, Dixon does not have standing to challenge the search because he had a reduced expectation of privacy as a result of his being on federal supervised release, and thus, at the time of the search, he lacked an expectation of privacy that society would consider reasonable in his residence. Opp. at 9-12. The Government relies principally on Samson v. California, 547 U.S. 843, 848 (2006), in which the Court held that suspicionless searches of California parolees' persons do not violate the Fourth Amendment, id. at 857, and United States v. Lopez, 474 F.3d 1208 (9th Cir. 2007), overruled in part on other grounds by United States v. King, 687 F.3d 1189 (9th Cir. 2012) (en banc), which held that a suspicionless search of a parolee's home did not violate the Fourth Amendment, id. at 1212-13. "Given the[se] holdings," argues the Government, "there is no reason for this Court to find that society would recognize the defendant to have a reasonable expectation of privacy in the very apartment that he had reported to reside at and therefore agreed to subject to warrantless searches." Opp. at 11.

The Court is not persuaded. And that is so because the Government's argument conflates the standing inquiry with the subsequent inquiry as to whether a search, once

6

properly challenged, qualifies as "reasonable." Though both inquiries turn on reasonableness—the "touchstone of the Fourth Amendment," Samson, 547 U.S. at 855— the inquiry into whether Dixon has standing is "theoretically distinct from the merits of [his] Fourth Amendment claim." Rakas, 439 U.S. at 133; see also Grandberry, 730 F.3d at 975. While Samson and Lopez did conclude that parolees—and by extension those on federal supervised release, see United States v. Betts, 511 F.3d 872, 876 (9th Cir. 2007) (equating parole and federal supervised release for Fourth Amendment purposes)—had not suffered a Fourth Amendment violation based on the suspicionless searches of their person and residence, respectively, they did not purport to decide whether the defendants in those cases had standing to bring their Fourth Amendment claims. See Samson, 547 U.S. at 848; Lopez, 474 F.3d at 1212-13. Rather, they addressed whether those claims, once brought, would be successful. Samson, 547 U.S. at 848; Lopez, 474 F.3d at 1212-13.

The Ninth Circuit has explicitly recognized as much, stating in Grandberry that "Samson is not itself a case about Fourth Amendment standing." 730 F.3d at 975; see also Samson, 547 U.S. at 855 n.4. Indeed, Samson framed the question as whether the warrantless search of the parolee's home was "reasonable within the meaning of the Fourth Amendment," id., not whether the defendant had the authority to challenge that search. Lopez, too, held that "the parole search in question did not violate the Fourth Amendment," not that the defendant lacked standing to contest the issue. Samson, 730 F.3d at 1214; cf. Rakas, 439 U.S. at 140 (characterizing Fourth Amendment standing doctrine as inquiring whether the defendant is "entitled to contest the legality of a search," not whether the search is unlawful). The Government's argument, thus, conflates the threshold standing inquiry with whether, on the merits, Dixon would be successful in demonstrating that a search of his residence would be unreasonable.[2]

The Government also makes much of dicta in Judge Watford's concurrence in Grandberry, which observed the oddity that parolees have a greater expectation of privacy

---

[2] Because the Court concludes that, even were the apartment at issue Dixon's residence, he has standing to challenge the search, whether he was a resident is immaterial to the analysis.

7

in the homes of others than in their own homes. 730 F.3d at 983 (Watford, J., concurring). The Government points to Judge Watford's statement that "[h]ad the warrantless search at issue here occurred at [the defendant's] own home, he would not have been able to seek suppression of the evidence. As a parolee subject to California's standard condition authorizing warrantless, suspicionless searches of his residence, [he] has no legitimate expectation of privacy in his own home." Id.; Opp. at 12. The Government takes this statement to mean that if the search in that case had been of the defendant's house (rather than a house in which he was a guest), he would have lacked standing. Opp. at 12.

But, again, the Government's reading misses the distinction between Fourth Amendment standing and the merits of whether a search violated the Fourth Amendment. Lopez, on which Judge Watford relied, see Grandberry, 760 F.3d at 983 (Watford, J., concurring) (citing Lopez, 474 F.3d at 1213), addressed whether a search violated the Fourth Amendment—not whether the defendant had standing to challenge that search. Lopez, 474 F.3d at 1214. And so the dicta in Judge Watford's concurrence, read in the context of its reliance on Lopez, is better read to recognize the oddity that, on the merits, a defendant would be more likely to successfully challenge a suspicionless search of a home in which he was a guest than one in which he lived. See Grandberry, 760 F.3d at 983 (Watford, J., concurring).[3]

Judge Berzon's concurrence, written "to respond to Judge Watford's suggestion," reads Judge Watford's concurrence in just this way. Id. at 985 (Berzon., J., concurring). Judge Berzon responds by pointing out that there are reasons to provide greater Fourth

---

[3] The Court also observes that, even were the Government correct about the dicta in Judge Watford's concurrence, this Court would not be free to craft the rule that the Government proposes. And that is so because, as already noted, (1) defendants on supervised release retain Fourth Amendment protections, Samson, 547 U.S. at 850 n.2, and (2) "[a]t the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Florida v. Jardines, 569 U.S. 1, 6 (2013) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961). So, since the barest minimum of Fourth Amendment rights would protect one's ability to challenge a search of his home, and defendants on supervised release retain at the very least that bare minimum, defendants on supervised release retain Fourth Amendment standing to challenge searches of their homes. Reading the dicta in Judge Watford's concurrence as the Government suggests, therefore, would run afoul of Supreme Court precedent.

8

Amendment protection to residences in which a parolee is a guest than one in which he is a resident, because "[t]he State has an interest protecting the privacy of its law-abiding citizens from intrusion on the basis of simple association with a parolee." Id. This argument addresses the merits question of whether the Fourth Amendment should permit such suspicionless searches—not whether the parolee may challenge them. See id.

In addition, as Grandberry's majority opinion reasoned—and which Judge Watford joined—"the government [was] wrong in asserting that Samson stripped parolees of any Fourth Amendment protection." 730 F.3d at 975 (emphasis in original); see also Samson, 547 U.S. at 855 n.2 & n.4 (agreeing with dissent that parolees retain greater Fourth Amendment protections that prisoners). And so Grandberry and Samson both confirm that defendants like Dixon maintain a "legitimate expectation of privacy," Rakas, 439 U.S. at 143, and thus that they have standing to challenge searches of their homes. This is also consistent with United States v. King, 736 F.3d 805 (9th Cir. 2013), which held that a suspicionless search of a probationer's residence did not violate the Fourth Amendment, because, although the defendant retained a reasonable expectation of privacy, id. at 809, the search was nevertheless lawful because "[b]alancing the slight intrusion on Defendant's expectation of privacy against the government's significant need to promote its legitimate governmental interests, we hold that the search conducted here was reasonable." Id. at 810. In other words, King held that the defendant had standing to challenge the search of his home—otherwise there would be nothing to "balance"—but that the search did not violate the Fourth Amendment. Id. at 809-10.

Thus, the Court concludes that if Dixon were a resident of the apartment, he has standing to challenge the search of the apartment. And so, because regardless of whether he is an overnight guest or a resident, he has standing to challenge the search of Apartment K, the Court now addresses the lawfulness of that search.

### 2. Lawfulness of the Apartment Search

Dixon argues that the search of the apartment was unlawful because the officers did not have probable cause to believe that he resided there prior to conducting the search.

9

Mot. at 5. The Court agrees.

The Ninth Circuit has imposed two requirements that must be satisfied before law enforcement can lawfully search the residence of someone on supervised release without a warrant. First, that person must be subject to a warrantless search condition. See Lopez, 474 F.3d at 1212–14. Second, the "law enforcement officers conducting the search must have probable cause to believe that [that person] is a resident of the house to be searched." See United States v. Howard, 447 F.3d 1257, 1262 (9th Cir. 2006) (quoting Motley v. Parks, 432 F.3d 1072, 1080 (9th Cir. 2005) (en banc) (overruled in part on other grounds)). There is no dispute that the first requirement is met here; the dispute turns on the second.

The Ninth Circuit has explained that the second prong of the test "concerns a precondition for a search pursuant to a parole condition—namely, warrantless entry into a particular residence—not the propriety of the parole search itself." Grandberry, 730 F.3d at 975 (emphasis in original). "Probable cause as to residence exists if an officer of 'reasonable caution' would believe, 'based on the totality of [the] circumstances,' that the parolee lives at a particular residence." Id. (quoting United States v. Diaz, 491 F.3d 968 (9th Cir. 2007)). This is a "relatively stringent standard . . . which requires more than a mere well-founded suspicion[.]" Id. at 976 (internal quotations omitted).

Grandberry recognized four factors (hereinafter "Howard factors") that govern when determining whether "officers have probable cause to conclude that a parolee lived in a residence":

> (1) the parolee did not appear to be residing at any address other than the one searched; (2) the officers had directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base; (3) the parolee had a key to the residence in question; and (4) either parolee's co-resident or the parolee himself identified the residence in question as that of the parolee.

Id. (internal quotations omitted) (citing Howard, 447 F.3d at 1265). Of particular note, the Ninth Circuit recognized that, though entitled to some weight, "a parolee's presence at a residence, even if frequent, does not, standing alone, establish probable cause that the parolee lives there." Id. at 978. Two cases, Grandberry and United States v. Hopkins, 701

10

Fed. Appx. 636 (9th Cir. 2017), provide useful tethers for this analysis.

In Grandberry, the Ninth Circuit found that the officers did not have probable cause to search the residence of a parolee they suspected of selling drugs. Grandberry, 730 F.3d at 980. There, the officers had learned from a police database that the Grandberry lived at 10652 South Manhattan Pl. in Los Angeles. Id. at 971. After observing Grandberry sell crack cocaine away from his listed address, the officers followed Grandberry to an apartment complex at 3418 S. Arlington Ave. Id. The officers conducted surveillance on Grandberry over eleven days and (1) they observed Grandberry entering the Arlington building between six and ten times using keys in his possession, usually alone; (2) after observing Grandberry enter the building, they occasionally saw movement through the window of a second-floor unit, and once saw him looking out of that window; (3) they once saw him leave the building, hand a man in a parked vehicle a paper bag, and reenter the building; (4) when attempting to arrest Grandberry outside of the building, they observed Grandberry toss keys onto the ground; and (5) upon arrest, one officer told Grandberry he intended to search Grandberry's home, to which Grandberry responded: "do what you gotta do." Id. at 971–72.

The court noted first that Grandberry's statement to the police upon arrest did not constitute an admission that he lived at the Arlington apartment building—the fourth Howard factor. Id. at 977.

Equally important to the analysis is what the officers did not observe or do. The officers never saw Grandberry at the Arlington apartment building late at night or early in the morning. Id. at 977–78. No officer:

> [C]hecked the names on the building's mailboxes to see if Grandberry received mail there. None of them ever observed him carrying groceries, laundry, newspapers, or mail. None asked any neighbors whether Grandberry lived there; examined the building's trash for whether it contained anything of Grandberry's; or investigated who leased or lived in the Arlington apartment.

Id. Accordingly, the court reasoned that the government had made no observations that could give them reason to suspect that Grandberry was living there—the second Howard

11

factor. Id. at 979. Finally, the officers conducted only a brief surveillance of Grandberry's listed address and did not see him there or ask anyone at the house whether Grandberry lived there. Id. at 972. Thus, the Ninth Circuit concluded, the government had made an inadequate showing that Grandberry did not appear to be residing at any other residence—the first Howard factor. Id. at 977–78.

The Ninth Circuit was also unpersuaded by what the officers had seen. Though Grandberry had a key to the Arlington apartment, the court concluded that "such a fact, standing alone, does not establish probable cause." Id. at 979. The Court then determined that "there was no basis for doubting that Grandberry lived where he had reported he did[.]" Id. at 980. It thus concluded that the officers lacked probable cause to believe that Grandberry lived in the searched apartment. Id. at 980.

By contrast, in Hopkins, the Ninth Circuit found that the officers did have probable cause to believe that Hopkins was living at a location that was not listed as his residence. 701 Fed. Appx. at 638. There, Hopkins, a parolee, had been living in a motor home at "the 2187 address" and had listed that address with the sex-offender registry. Id. At one point, a teenager emerged from the 2187 residence and identified himself to the officers as the Hopkin's nephew. Id. The teenager told the officers that Hopkins had moved to "the 2225 address" and identified a car parked at the same address as Hopkins. Id. Officers also discovered that the car was registered to both Hopkins and to the 2225 address. Id.

The court held that the officers had probable cause to believe that Hopkins had moved to the 2225 address, stating "defendant's nephew had no apparent reason to lie, and his information was independently corroborated by the registration of the car in two relevant specifics (owner and address)." Id. at 638–39.[4] Hopkins indicated that great weight should be placed on information obtained from unbiased sources regarding the defendant's true residence that has been corroborated by independent police investigation.

---

[4] Though Hopkins did not deem the Howard factors "particularly apt" in that case, 701 Fed. Appx at 639, the court did not purport to overrule the Howard factors; it merely acknowledged that not all situations could be easily analyzed using those factors. Id.

12

Id. at 639.

The Government acknowledges that Grandberry identifies factors that guide the probable-cause-of-residence determination. Opp. at 14. But it fails to address whether it has met the Howard factors. Instead, it asserts that "by the time Ochoa picked-up [sic] the keys the defendant had dropped on the ground . . . the facts already known to him were sufficient to establish probable cause." Id.

These arguments are unpersuasive. Applying the Howard factors, the officers had significantly less reason to believe that this apartment was Dixon's address than the officers had in Grandberry, and thus no probable cause to believe that the apartment was Dixon's residence.

The first Howard factor is whether the parolee appeared to be residing at any address other than the one searched. Id. at 976 (citing Howard, 447 F.3d at 1265). Dixon argues that the first Howard factor supports his position because the officers, despite knowing of three possible alternative addresses at which Dixon could have been residing, "did absolutely nothing to eliminate these alternative addresses as Dixon's residence[.]" Repl. at 6. In Grandberry, the court held that a brief surveillance of the defendant's listed address was insufficient to determine whether he actually lived there. Grandberry, 730 F.3d at 977–78. Here, there is no evidence that the police conducted any surveillance of any of Dixon's listed addresses. Ochoa Decl. ¶ 12. Nor is there any evidence that the officers asked anyone in any of the listed addresses' neighborhoods whether Dixon lived there, as did the officers in Hopkins. See 701 Fed. Appx. at 638; Ochoa Decl. The Government thus fails to make an adequate showing of the first Howard factor.

The second Howard factor is whether the officers directly observed something that gave them a good reason to suspect that the parolee was living at the unreported residence. Grandberry, 730 F.3d at 976 (citing Howard, 447 F.3d at 1265). Dixon argues that the Government fails this factor because the observations Ochoa made here are much weaker than the observations made by the officers in Grandberry. Repl. at 7. Grandberry noted that no officer had "checked the names on the building's mailboxes to see if Grandberry

13

received mail there . . . . ever observed him carrying groceries, laundry, newspapers, or mail . . . . asked any neighbors whether Grandberry lived there; examined the building's trash for whether it contained anything of Grandberry's; or investigated who leased or lived in the Arlington apartment." Grandberry, 730 F.3d at 977–79.

Here, the officers similarly failed to make such observations. In fact, Ochoa knew that Shackleford was the primary tenant of Apartment K yet never in the course of his two-month surveillance asked her whether Dixon lived with her. He did not do so until after he had entered the apartment. Ochoa Decl. ¶ 5. Though Ochoa observed Dixon at the Oakdale apartments several times over the course of two months, he never observed him conducting any of the activities traditionally associated with residence, save for carrying two trash bags on the date of the search. Id. ¶¶ 8–10. As the Ninth Circuit has instructed, "a parolee's presence at a residence, even if frequent, does not, standing alone, establish probable cause that the parolee lives there." Grandberry, 730 F.3d at 978. All of Ochoa's observations, even if taken as true, do not amount to "a good reason to suspect that the parolee was using his unreported residence as his home base." Id. at 976 (citing Howard, 447 F.3d at 1265). Thus, the of the second Howard factor does not support the Government's position.

The third Howard factor is whether the person on supervised release had a key to the residence in question. Id. Dixon unquestionably had a key to Apartment K. Ochoa Decl. ¶ 27; SFPD Incident Report at 5. The Government argues that this fact, in conjunction with the prior observations made by Ochoa, establishes probable cause. Opp. at 14. It appears that the officers here did not know that the keys dropped by Dixon would grant access to Apartment K until they tried them in the lock. Though at least one other circuit has held that inserting a key into a lock on a door to identify whether the key unlocks the door is itself a Fourth Amendment search, see e.g., United States v. Bain, 874 F.3d 1, 15 (1st Cir. 2017) ("[W]alking up to the door of a home and trying keys on the lock does not differ markedly from walking up with a trained police dog to sniff around the door [which is a search under Supreme Court precedent]."), the Ninth Circuit has not. In

14

fact, the Ninth Circuit has held that inserting a car key into a lock to identify that the person possessing the key had access to the car protected by the lock is not, without more, a search. United States v. $109,179 in United States Currency, 228 F.3d 1080, 1088 (9th Cir. 2000) ("[I]nserting the key into the car door lock for the purpose of identifying [defendant] was not an unreasonable search prohibited by the Fourth Amendment.").

Though the insertion of the key into the lock on the front door of the apartment may be distinguishable from Currency because of the different privacy concerns implicated by a car and a residence, this Court need not decide whether insertion of a key into a residence's lock is a search. And that is so because even if the insertion of the key into the lock is not a search, the officers here still did not have probable cause to believe that Apartment K was Dixon's residence. Possession of a key alone is not enough to establish probable cause as to residency, Grandberry, 730 F.3d at 979, and, as in Grandberry, the police's limited surveillance and failure to investigate Dixon's other possible addresses, even coupled with the fact that Dixon possessed the key, does not rise to the level of probable cause. See id. at 979–80. The officers here only observed Dixon enter Apartment K once, and there is no evidence that Dixon used a key when doing so. Thus, even if the officers' knowledge that Dixon possessed a key to the apartment were not part of the search, but see Bain, 874 F.3d at 15, and thus constitutes an adequate showing of the third Howard factor, that alone would not be enough to establish probable cause under the Motley/Howard rule. See Grandberry, 730 F.3d at 979 (holding that possession of a key "standing alone, does not establish probable cause.").

The fourth Howard factor is whether the person on supervised release, or their co-resident, identified the residence in question as that of the person on supervised release. Id. at 976 (citing Howard, 447 F.3d at 1265). Dixon correctly argues that the Government does not make an argument as to this factor. Grandberry noted that Grandberry's statement to the officers ("do what you gotta do") upon arrest was insufficient to satisfy the fourth Howard factor, as it did not unambiguously identify the apartment to be searched as Grandberry's residence. Grandberry, 730 F.3d at 977. Here, there is no

15

evidence that Dixon made any statement at all, much less one identifying Apartment K as his residence. And Shackleford's confirmation that Dixon rented a room in Apartment K cannot justify the officers' search because it came after the search had unequivocally begun. Repl. at 10; Ochoa Decl. ¶ 23. Thus, the Government fails to make an adequate showing of the fourth Howard factor.

Since the Government has made an inadequate showing of at least three of the Howard factors, the Government has not shown that the officers had probable cause to search Apartment K. Thus, the search of the apartment was unlawful. This Court therefore GRANTS Dixon's motion as to the searches inside the apartment.

### B. The Blue Honda Minivan[5]

Dixon next argues that the officers' search of the vehicle violated the Fourth Amendment. Mot. at 5. This claim fails because Dixon's warrantless search condition extends to vehicles in his possession and under his control.

Dixon argues that "it appears that the only cause SFPD officers had to believe that the minivan was Dixon's was the insertion of a key [that Dixon had dropped] into the van," and that that insertion was a search. Id. He also argues, citing no cases in support, that the officers needed probable cause to believe that the vehicle belonged to Dixon as a precondition of the search, as is the case for a parolee's residence. Repl. at 15.

Even if the officers did need such probable cause, the Ninth Circuit has held that the insertion of a key into a car's lock for the purposes of identifying that the defendant had access to the car is not a search within the meaning of the Fourth Amendment. Currency, 228 F.3d at 1087-88. The court stated that the defendant had at most "a minimal expectation of privacy in the lock of his car door," and that "the police may conduct limited searches of vehicles to ascertain ownership on less than probable cause." Id. at

---

[5] Because the Court concludes that the searches of the vehicle and Dixon's person were lawful, the Court need not address whether Dixon has standing to challenge these searches. See Byrd v. United States, 138 S. Ct. 1518, 1530 (2018) ("Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim.").

1088. While the possession of a key to a house is not enough to establish <u>residence</u> in that house, <u>Grandberry</u>, 730 F.3d at 979, the relevance of the Ninth Circuit's analysis in <u>Currency</u> is that possession of a key, at the very least, establishes <u>control</u> over a car. See Opp. at 21. Unlike a key to a residence, which under <u>Grandberry</u> is not alone enough to establish probable cause as to residency, the Court sees no reason to conclude the key to a vehicle would not establish probable cause as to control in this context. And that is so because the terms of Dixon's supervised release permit, as Dixon concedes, Repl. At 15, warrantless searches for a "vehicle . . . under his control." Dkt. 135 at 4.

Since the officers were able to establish that Dixon had control over the car by inserting the key into the car door's lock and confirming that it unlocked the door, Dixon's warrantless search condition permitted the officers to search the minivan without a warrant. The Court DENIES Dixon's motion as to the search of the blue Honda minivan.[6]

Dixon alternatively requests an evidentiary hearing regarding (1) the validity of Ochoa's claims that he would have arrested Dixon for possession of the marijuana found in the minivan alone and (2) the legality of the seizure of the marijuana from the minivan. Repl. at 2; <u>see also</u> Ochoa Decl. ¶ 27. The Court DENIES this request because state police

---

[6] Dixon asserts that the analysis in <u>Currency</u> may be faulty because it does not follow the property-based analysis articulated in <u>United States v. Jones</u>, 565 U.S. at 404–05. Repl. at 17. However, he cites no Ninth Circuit case that supports the proposition that the property-based analysis in <u>Jones</u> overrules the holding in <u>Currency</u>.

He further argues that under <u>United States v. Portillo-Reyes</u>, 529 F.2d 844 (9th Cir. 1975), "the insertion of [a] key into the door of [a vehicle] to see if it fit constituted the beginning of a search." Mot. at 4 (citing <u>Portillo-Reyes</u>, 529 F.2d at 848). However, the court in <u>Currency</u> distinguished <u>Portillo-Reyes</u>, saying "[in <u>Portillo-Reyes</u>, law enforcement] did far more than determine whether the key fit the lock on the door. Instead, they used the key to gain access to the interior of the vehicle and conducted a search . . . ." 228 F.3d at 1087. <u>Currency</u> went on to state that "[f]itting the key into the car door lock did not give police any knowledge about the contents inside the vehicle, but revealed only that [defendant] had access to that car." <u>Id.</u> at 1088. Here, the police gained access to the car using Dixon's discarded key—which was entirely permissible under <u>Currency</u>, 228 F.3d at 1087-88. They then had probable cause to believe—again, even assuming that this requirement applies to vehicles—that the vehicle belonged to Dixon (or at least was property under his control) at the instant that they determined that the key fit the minivan's door lock. At that point, the officers could search the minivan pursuant to the Dixon's warrantless search condition.

1 officers can legally arrest persons for violations of federal law, § 4:30, Identification and
2 Immigration, Cal. Search & Seizure § 4:30, and because the search of the minivan was not
3 unlawful. Additionally, testimony about what Ochoa would have done under different
4 circumstances than those in the case at bar would be speculative at best.

### C. Dixon's Person

Dixon's last claim is that the officers' search of his person at the Bayview Station was unlawful because it arose out of an illegal arrest. Mot. at 5. He asserts that "had the officers not conducted their illegal searches, Dixon would not have been taken into custody and he would not have been present at the Bayview Station for the officers to discover the contraband on his person." Id. The Supreme Court has held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." Samson, 547 U.S. at 857; Betts, 511 F.3d at 876 (equating parole and federal supervised release for Fourth Amendment purposes). Ochoa stated that he ordered his fellow officers to "detain Dixon in order to conduct a federal probation [sic] search on him." SFPD Incident Report at 5. So, Ochoa was acting within constitutional bounds under Samson when he searched Dixon after searching Apartment K. See Samson, 547 U.S. at 857 ("the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee.") (emphasis omitted). However, that search did not reveal any drugs, only $897 in cash. Ochoa did not search Dixon's person again until he observed conduct which he believed indicated that Dixon was concealing contraband at the Bayview Station.

Dixon raises a "fruit of the poisonous tree" claim, arguing that he was "clearly arrested and transported to Bayview Station as a result of the discovery of narcotics in Apartment K, the arrest and the fruits of that arrest must also be suppressed[.]" Repl. at 14. In his motion, Dixon claims that "[s]uch 'fruit' includes all evidence obtained within Apartment K, as well as the evidence seized from Dixon's vehicle and his person[.]" Mot. at 6. But in his reply, Dixon appears to only be asserting that the search of his person at the Bayview station is such a "fruit." Repl. at 14 ("The government has not met its burden to prove that Dixon's arrest was somehow attenuated from the search of Apartment K.").

18

The lawful car search stymies Dixon's argument. As the Government argues, "[t]he marijuana recovered from the van is the product of an altogether separate search that is untainted by any alleged illegality related to the search of the apartment." Opp. at 23; see Nix v. Williams, 467 U.S. 431, 447 (1984) ("[I]f the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police[.]"). It thus argues that, even if the apartment search were unlawful, the lawful search that uncovered marijuana in Dixon's minivan "provided a separate, lawful basis for the defendant's arrest due to a violation of his supervised release." Opp. at 22. Thus, it argues, "the marijuana in the van served as yet another basis for the defendant's arrest and eventual search." Id. at 23.

The Government is correct. "State and local officers generally have authority to make stops and arrests for violation of federal criminal laws." § 4:30, Identification and Immigration, Cal. Search & Seizure § 4:30. As discussed, the warrantless search of the car was lawful. And the drugs that the officers found in that car gave rise to probable cause to arrest Dixon. Thus, Dixon's arrest was permissible, and the drugs later discovered as a result of that search were not fruit of the poisonous tree. Accordingly, Dixon's motion is DENIED as to the search of his person at the Bayview Station.

## IV. CONCLUSION

For the foregoing reasons, this Court GRANTS Dixon's motion as to the search of Apartment K and DENIES the motion as to the search of the vehicle and Dixon's person. The Court DENIES Dixon's request for an evidentiary hearing on the search of Dixon's minivan.

**IT IS SO ORDERED.**

Dated: November 20, 2018

_____
CHARLES R. BREYER
United States District Judge