STEVEN G. KALAR
Federal Public Defender
Northern District of California
ELIZABETH M. FALK
JULIANA DEVRIES
Assistant Federal Public Defenders
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    (415) 436-7700
Facsimile:    (415) 436-7706
Email: Elizabeth_Falk@fd.org

Counsel for Defendant DIXON

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br><br>HOWARD DIXON,<br><br>Defendant. | **Case Nos:**<br><br>**CR-13-328 CRB**<br><br>**CR 18–00319 CRB**<br><br>**DEFENDANT'S GUIDELINES OBJECTIONS AND SENTENCING MEMORANDUM**<br><br>**Court:**  Courtroom 6, 17th Floor<br>**Hearing Date:**  March 15, 2018<br>**Hearing Time:**  10:00 a.m. |

**INTRODUCTION**

Mr. Dixon now faces sentencing on two federal cases; three convictions for misdemeanor drug possession under 21 U.S.C. § 844, and a Form 12 violation for violating his supervised release by possessing the three drugs at issue. As decided by the jury, the Form 12 allegations comprise Grade C violations because they are misdemeanor convictions. Because the Court can easily take judicial

notice of these misdemeanor convictions and find the Grade C violations based on same, there is no need for any additional litigation on the Form 12.

As of May, 2018, nearly a year ago, the government had Mr. Dixon in custody on the Form 12 charges. The government could have sought up to 24 months from this Court on that Form 12 (with up to 12 months of supervised release to follow) for the small-quantity drug violations it instead opted to take to trial. This case could have, and should have, resolved in less than a month. Instead, the government opted to pursue new federal charges and all the attendant litigation that arose from those charges. Instead of facing the state court maximum of 12 months in custody (with half-time) that his San Francisco state court public defender advised, Mr. Dixon suddenly found himself fighting three 20 year maximums with predicate value to the government as future enhancements. He has no choice but to litigate this case because the government refused to charge the lesser-included offenses he would have pleaded guilty to. The result was a ton of work for everyone, including the Court, the parties, and the jurors who sat through a 4 day trial. In this particular case, however, that work was not the result of ill-fated choices made by Mr. Dixon, nor an unwillingness to accept responsibility for possessing the drugs at issue. That inefficiency was the result of the government's charging decisions. This Court should not hold those charging decisions against Mr. Dixon now.

Because this Court sat through the trial of Mr. Dixon and fully engaged with the parties' papers in determining Mr. Dixon's Motion to Suppress, it is safe to say that this Court is well versed in the facts of this case. All that remains is the proper sentence that must be imposed in a protracted litigation that has already dragged on for too long. Because the Probation Department did not sit through the trial of Mr. Dixon, and accordingly cannot be expected to understand the many facts involved in the case, its conclusions as to the Guidelines and the Offense Conduct are of limited value and should not be replaced by this Court's first-hand judgment. As will be discussed below, Mr. Dixon consistently has agreed he possessed illegal drugs and would have pled guilty to 3 charges under 21 U.S.C. § 844 had the opportunity been available to him. In a similar vein, the application of U.S.S.G. §2P2.1 to this case (Possession of Drugs in Prison) is far afield legally and factually and is a huge stretch for a cross-reference that is meant to cover a different scenario altogether. No matter how you slice it, the proper Guideline range is a straight Offense Level 8, the top offense level in the

DEFENDANT'S SENTENCING MEMORANDUM
*DIXON*, CR 18–00319 CRB

2

drug possession guideline under U.S.S.G. §2D2.1, less two points for acceptance of responsibility. At Offense Level 6, CHC VI, the proper range is 12-18 months in Zone C, which may be satisfied by 6 months home or community confinement coupled with 6 months in custody.  As for the Form 12, the Grade C violation range for the misdemeanor drug convictions is 7 to 13 months.

The bottom line is this; the drug charges at issue and the quantities of drugs involved here are quintessential state-court charges that should have remained in state court, where Mr. Dixon would have at most faced a year in county jail under Proposition 47, served at 50% time for a total of 6 actual months in custody.  The federal drug charges should have never been brought here.  Mr. Dixon should not be sentenced to any longer in custody on those charges than the state court would have imposed for the same conduct – 6 months in custody.  Any longer sentence would encourage the type of inefficient charging decisions that led the parties down this protracted road of unnecessary litigation in the first place.

As for the Form 12 violation, it is completely appropriate to sanction Mr. Dixon for his conduct – but the Court should be mindful of the typical violation sentence that would be imposed for possession of small quantities drugs by an individual with an admitted relapse, who made independent effort to enroll in drug treatment prior to arrest.  On the flip side, this must be balanced Mr. Dixon's criminal history and the challenges he's had on federal supervision.  While Mr. Dixon has been on federal supervision a long time, this most recent conviction is smaller in scale than his past convictions, which suggests on the whole that his criminal conduct is de-escalating.  His record, however, speaks for itself, and Mr. Dixon would be foolish to ignore it here.  How much weight to give to that record and Mr. Dixon's criminal history is the Court's call.

All told, the appropriate sentence here advocated by the undersigned is the 6 month actual state-court maximum on the drug possession charges, coupled with a 9 month consecutive, mid-range sentence for the supervised release violation, for a total custodial term of 15 months in custody, with one year of supervised release to follow.  This is the sentence that undersigned counsel would have advocated for back in June, 2018, had this case proceeded on the Form 12 alone and Mr. Dixon had faced a 24 month maximum on that violation.  Such a sentence would have been a stiff supervised violation sentence that sufficiently accounts for Mr. Dixon's recidivism.  It also would have been

high enough to encourage the San Francisco D.A. to ultimately dismiss the state court charges against Dixon, either before or after Form 12 proceedings.

## STATEMENT OF FACTS

### I. Mr. Dixon is Arrested and a Form 12 Petition for Warrant is Filed.

On March 13, 2018, United States Probation filed a Form 12 charging Mr. Dixon with violating the terms and conditions of his supervised release because an apartment, a car and Mr. Dixon's person were searched by law enforcement and drugs were located. As the violation proceedings commenced, the quantities of drugs at issue became clear; 15.74 grams of cocaine salt and 8.7 grams of heroin in the apartment; approximately 4 pounds of marijuana[1] in the apartment and car (lawful in the State of California) and 3.949 grams of cocaine, 2.7 grams of heroin, and 1.085 grams of methamphetamine on Mr. Dixon's person. As required, Mr. Dixon notified USPO Unalp of the arrest, and disclosed that he possessed and/or used heroin and cocaine on his next monthly report to probation. *See* Declaration of Elizabeth M. Falk ("Falk Decl.") filed herewith at Exhibit A. Prior to Mr. Dixon's arrest, he self-enrolled in a community outreach drug treatment program, Positive Directions Equals Change and continued attending those classes until his arrest on the Form 12. *See id*., Exhibit B.

Mr. Dixon was quickly charged in state court for the drugs, and immediately bailed out of custody. He made all his state court appearances while his state court lawyer attempted to work out a Proposition 47 deal whereby Mr. Dixon would plead to misdemeanor drug possession offenses. State court defense counsel, however, was well aware of the federal supervised release issue and the potential effect any admission in state court could have on the federal proceeding. *See* Second Falk Declaration at ¶ 3.

In May, 2018, Mr. Dixon was taken into federal custody. By email, state defense counsel and the undersigned then communicated in an effort to find a custodial sanction on the federal side that

---

[1] San Francisco Police Department issued Mr. Dixon a property receipt for the marijuana, along with his keys and $897 in cash. See Falk Declaration, Exhibit C. In state court, this marijuana is apparently not seizable contraband.

would satisfy the state court DA to dismiss the charges, thus killing two birds with one stone without the need for a CPC 1381.5 process.  *See id.* at ¶ 4.  It was the undersigned's intention to then negotiate with the U.S Attorney's office for a stipulation between Mr. Dixon, the San Francisco D.A., and the AUSA as to an appropriate Form 12 sentence that was sufficient enough to satisfy the San Francisco D.A. to dismiss the state case.  *Id.* at ¶ 5.

When it comes to the intersection of new state charges and federal Form 12 supervised release violation notices, these types of negotiations are common because they serve the ends of efficiency in multiple courts.  When a deal is reached, there is no litigation on the Form 12, and no need for a trial in state court.  This is particularly true in small quantity drug cases because Prop 47 has uniformly reduced all state court drug possession charges to misdemeanors with a punishment of no longer than a year of county jail – and these non-violent sentences are served at 50% credit.  Small-time drug cases are accordingly not worth much to county D.A.s.  6 months of federal BOP custody (a sentence for which no good time credit is afforded) is the equivalent to the longest Prop 47 sentence that can now legally be imposed in state court on simple drug possession cases.

If a deal cannot be reached, the common course in cases such as this is for the federal state court Form 12 to trail the state case, so a defendant is not forced to make admissions in the federal Form 12 proceeding that will affect the state case.  Once the federal district judge sees the state court resolution, he or she is in a good position to evaluate the conduct at issue and impose an appropriate Form 12 sentence that takes into account the global punishment an individual receives for new law violations.[2]

---

[2] It is true that there are some types of state law violations that lead to new federal charges for defendants already on federal supervised release.  New felon-in-possession charges in state court, for example, almost always lead to a new federal gun charge if the defendant is on federal supervised release at the time the new state case is charged.  The undersigned is unaware of any other defendants, however, who have been charged in federal court with distribution of the drug quantities at issue here.

DEFENDANT'S SENTENCING MEMORANDUM
*DIXON*, CR 18–00319 CRB

## II.     The Federal Charges.

Instead of following the "normal" course on Form 12s for minor state court drug charges, however, the U.S. Attorney's office decided to indict the drug case federally as a distribution case.[3] While in custody on the Form 12, Mr. Dixon was charged on July 17, 2018, with possession of heroin, cocaine, and methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841. Dkt. 1, Indictment.[4] As this Court is well aware, the quantities of drugs at issue in this case are very small.  This Court litigated and partially granted a motion to suppress and subsequently, sat through a trial where Mr. Dixon's opening statement conceded possession of the drugs at issue.  Indeed, from the time he submitted his March, 2018 monthly report to probation, through drug treatment, through negotiation efforts to resolve these charges in San Francisco Superior Court, Mr. Dixon has always admitted possession of the drugs he was charged with.  He never waivered on this point, and does not waiver today.  Witnesses at trial testified as to Mr. Dixon's relapse with drug use, and also the treatment efforts he made from February, 2018 through May, 2018, when his arrest on the Form 12 precluded further treatment.  Although the jury was not so advised, due to a supervision snafu, Mr. Dixon was not drug tested in January, February or March 2018.  His last test, in December 2018, was positive for marijuana.

After the anticipated 1 day jury trial turned into nearly a week, the jury found Mr. Dixon guilty of possessing all three drugs but declined to convict him on distribution.  This sentencing follows.

//

//

//

---

[3] Undersigned counsel has not been able to locate any cases where the federal government has charged stand-alone drug distribution counts for the quantities of drugs involved in this case either.  If a defendant is found in possession of a firearm, however, there are several examples on ECF of the federal government charging small quantities of drugs along with the firearm, either in an effort to prove up a charge under 18 U.S.C. § 924(c) or to ensure an enhancement for the firearm under U.S.S.G. §2K2.1.  In this case, no firearm was located, alleged or charged.

[4] Mr. Dixon was in federal custody on the Form 12 when the Indictment was returned. The San Francisco DA dropped the state drug charges once the federal government indicted.  There are no remaining state court proceedings against Mr. Dixon.

DEFENDANT'S SENTENCING MEMORANDUM
*DIXON*, CR 18–00319 CRB

# ARGUMENT

## I. THE GUIDELINE RANGE IS A STRAIGHFORWARD CALCULATION UNDER U.S.S.G. § 2D2.1

At trial, Mr. Dixon was convicted of possessing three different types of drugs in small quantities. These substances were all possessed at the same time, and were indisputably part of the "same transaction" or incident. The substances accordingly group, and the base offense level for simple possession of cocaine, heroin and methamphetamine is **8**. *See* U.S.S.G. 2D2.1(a)(1). Because he accepted responsibility for possessing these drugs at the get-go (and officially accepted responsibility as early as his March, 2018 monthly report to the Probation Department) Mr. Dixon is entitled to his acceptance of responsibility credits. **The final adjusted offense level should be 6.**

## II. THE REQUESTED CROSS-REFERENCE TO U.S.S.G. §2P1.2 IS WRONG

The government and the Probation Department urge the Court to instead apply a cross-referenced Guideline, U.S.S.G. § 2P1.2, due to the fact that the drugs Dixon possessed were located in his pants at the Bayview Police Station's holding area. This section of the Guidelines, entitled "Providing or Possessing Contraband in Prison" correlates to convictions obtained for a violation of 18 U.S.C. § 1791 – also conveniently entitled "Possession or Providing Contraband in Prison." *Id*. Under that statute, the government must prove numerous elements, one of which is that the contraband at issue was possessed by or provided to "an **inmate** at a **prison**." *See* 18 U.S.C. § 1791(A)(1-2). A "prison," in turn, is defined as "a **Federal** correctional, detention or penal facility or any prison, institution or facility in which persons are **held in custody by direction of or pursuant to a contract or agreement with the Attorney General**." *See* 18 U.S.C. § 1791(d)(4).

Under no uncertain terms does the "Bayview Police Station's booking area" come close to meeting the definitions or elements of 18 U.S.C. § 1791. It is not a "jail" that houses "inmates" – it is a booking location where persons who are arrested are processed and await next steps – book and release, bail, or *await transit into 850 Bryant Street*. "Arrestees" are not "inmates" and U.S.S.G § 2P1.2 does not apply to arrestees who fail police station strip searches. Such individuals are not yet "inmates" and are a dime a dozen at police station booking areas. Most are arrested by surprise and

are holding contraband in private areas. This is a far cry from a situated inmate at a county jail or a federal prison who arranges to have drugs smuggled into the prison on their behalf.

If the government is correct on this point, then the application of the correct federal drug possession guideline turns on police action upon arrest, not the intent or voluntary action of the defendant. Many individuals hide contraband in their inner clothing, and individuals in this position are arrested and searched every day in San Francisco. These soon-to-be arrestees do not know that they are going to be arrested. They are not hiding contraband on their person in anticipation of smuggling items into a jail. If they happen to be arrested, then, their Guideline fate depends on how thoroughly an arresting officer searches them. Some police officers conduct thorough searches at the scene of arrest; others conduct minimal searches and count on the booking officers to search for additional contraband. The better an arresting officer searches at the scene, the lower the Guideline faced by a defendant in Mr. Dixon's possession. Here, had San Francisco police discovered the drugs on Mr. Dixon's person in the police car, or outside the apartment complex, the government would have no argument that U.S.S.G. §2P1.2 applies. While the federal sentencing Guidelines are often harsh and draconian, they are not written to turn on the search skills of local police officers.

A few quick LEXIS searches reveal the dubious nature and novelty of the government's argument. An All-Feds LEXIS search for "U.S.S.G. § 2D2.1" and "detention facility" returned zero cases. *See* Falk Decl. at ¶ 5. The same search revised for "U.S.S.G. § 2D2.1" and "jail" surfaces 9 cases nationwide, none of which have anything to do with enhanced sentencing for drug possession in a jail by means of a cross-reference to U.S.S.G. §2P1.2 – much less the possession of drugs in a defendant's underwear at a police station. *Id*. Similarly, a search under "U.S.S.G. § 2P1.2" and "drug!" captures 32 cases appealed or decided nationwide that applied this Guideline pursuant to convictions to drug contraband smuggled under 18 U.S.C. § 1791. Of those 32 cases, 30 address drugs smuggled into *federal* prison or *federal* pretrial detention centers where inmates who had been charged were in *federal* custody awaiting trial. *Id*. Only 2 cases addressed county jails at all; *United States v. Ponder*, 963 F.2d 1506 (11th Cir. 1992) and *United States v. Grey*, 675 Fed. Appx. 638, 639 (10th Cir. 2017). Both *Ponder* and *Grey* involved defendants who arranged drugs to be smuggled into county jails with Attorney General contracts to house federal inmates awaiting federal trials – as

18 U.S.C. § 1791(d)(4) requires. No case located by the undersigned applied U.S.S.G. § 2P1.2 to a defendant where the contraband that formed the basis of a federal prosecution was found at a police station directly following a defendant's arrest, prior to being charged in a federal case. There would have been no jurisdiction for the federal government to bring charges under 18 U.S.C. § 1791 against Dixon – and the Court should not allow that jurisdiction to be circumvented by means of a Guideline enhancement.

This dearth of cases returned by these searches at least suggests that no prior defendant in Dixon's position has been subjected to this cross-reference under these circumstances. Searches conducted under "U.S.S.G. § 2P1.2 and "detention facility" reveal 4 cases, all of which involve inmates who smuggled in or arranged drugs or contraband to be brought into a *federal* detention facility. *See* Falk Decl. ¶ 6. Search results from "U.S.S.G. §2D2.1" and "police station" (2 cases resulting) certainly do not support the government's position either. In *United States v. Chiles*, 1997 U.S. App. LEXIS 3146 (6th Cir. February 19, 1997), a police station search revealed 3.4 grams of crack cocaine in the defendant's possession. *Id*. at *3. That sentencing court proceeded under the regular § 2D1.1 Guidelines, with no mention of any cross-reference to U.S.S.G. § 2P1.2. The other case, *United States v. Akintomide*, 185 F.Supp.2d 1 (D.D.C. 2001) involved a consent search of luggage at a Greyhound bus station whereby drugs were located and the defendant subsequently confessed at a police station. *Id*. at *4.

In sum, the government's tortured reading of "detention facility" in U.S.S.G. § 2D 2.1 is clearly worded in this manner to cover "detention facilities" that have a *federal* nexus. *See, e.g., United States v. Joseph*, 716 F.3ed 1273, ("While incarcerated at a federal *detention facility*, defendant Deyvan Joseph obtained possession of marijuana on several occasions…."). Even if the government could somehow extend this Guideline to local jail facilities, the circumstances presented here are clearly afield of the ills that U.S.S.G. § 2P1.2 was designed to remedy – individuals who arrange or smuggle drugs into custody as *inmates* (as opposed to defendants arrested on the street who happen to have contraband hidden in their underwear.) In other words, the transport of the narcotics inside Dixon's underwear to the Bayview Station booking area was not a voluntary act on

his part, but a natural consequence of police action from which Dixon had no escape. This Court should decline to adopt the cross-reference to U.S.S.G. § 2P1.2 advocated in the PSR.

### III. DIXON IS ENTITLED TO A TWO-LEVEL ACCEPTANCE OF RESPONSIBILITY REDUCTION

As early as April, 2018, Mr. Dixon has accepted responsibility for possessing the drugs charged in the Indictment. First, he admitted possessing drugs on his March monthly probation report. *See* Falk Decl., Exhibit A. Second, he enrolled in Positive Directions Equals Change to address his relapse. *See id.*, Exhibit B. Third, his entire trial defense admitted simple possession of the drugs at issue, from opening statement through closing argument. Fourth, Mr. Dixon accepted responsibility and apologized for his conduct by means of the PSR process. *See* PSR at Objections, Paragraph 7 (referencing Mr. Dixon's letter of acceptance of responsibility.)[5] The sum of these factors, as well as this Court's first hand view of Mr. Dixon's trial defense, entitle him to acceptance credits. This is because at all times – pretrial, trial, and post-trial, Mr. Dixon has admitted the charges of conviction and did not make contrary statements outside of Court or during the PSR process. *See, e.g., United States v. Monk*, 15 F.3d 25, (2nd Cir. 1994)(defendant who went to trial on drug distribution charges but did not contest quantity of drugs nor the possession of the drugs awarded acceptance of responsibility credits after the jury found him guilty of possession only); *United States v. Barry*, 961 F.2d 260, 267 (D.C. Cir. 1992)(defendant not entitled to acceptance of responsibility credits after being convicted of drug possession at trial because during PSR process, defendant denied using drugs with the government witness relevant to count of conviction and told Washington Post newspapers that government witnesses at his trial were "canaries singing.")

### IV. THE COURT SHOULD NOT INCORPORATE AN OBSTRUCTION OF JUSTICE ENHANCEMENT

The probation officer correctly refused to incorporate a two level adjustment upward for Obstruction of Justice. *See* PSR, Objections, ¶ 3-4. The government requests this enhancement based upon its separately filed obstruction of and perjury charges. In the Ninth Circuit, in order for

---

[5] This letter was transmitted to the Probation Officer on February 21, 2019 and will be provided to the Court by the Probation Officer later today to be incorporated into the final PSR.

DEFENDANT'S SENTENCING MEMORANDUM
*DIXON*, CR 18–00319 CRB

the Court to find that a defendant obstructed justice through perjury and enhance a sentence under 18 U.S.C. § U.S.S.G. 3C1.1, it must find that (1) the defendant gave false testimony, (2) on a material matter, (3) with willful intent. *See United States v. Garro*, 517 F.3d 1163, 1171 (9th Cir. 2008). Here, the government's argument fails on all three required elements of an obstruction of justice enhancement.

First, there still has been no finding by the Court, and no factual record developed to date that Dixon's statement in his declaration was false that "he did not reside in Apartment K" at the time of the search that led to the discovery of evidence. As the Probation Officer notes, "it seems impossible to prove the issue of residence when someone stays at different places throughout a given week…where someone "lives" or "resides" is a matter of opinion. We see this all too often with similarly situated defendants who stay in multiple locations in any given week (with family, friends and significant others) and receive mail at a separate location." *See* PSR, Objections, ¶ 3. This Court previously reached the same conclusion at the hearing on the government's Superceding Indictment on November 16, 2018:

> Well, it may be a false statement. I don't say whether or not it's a true or false statement. I have no idea whether he lives there or not, and I could – and it's not – I'm trying to figure out how it's relevant to the motion to suppress.

*See* Docket 68, Transcript of Hearing at 8:19. Since that November 16, 2018 hearing, no additional factual record has been developed on this issue that warrants this Court reaching a different conclusion. The trial itself was sanitized as to Mr. Dixon's connection to Apartment K because the evidence found therein had been suppressed and the jury did not need to address that issue. And, given the Presentence Report's conclusion declining to apply the enhancement, it is evident that no further evidence as to Dixon's residence was ascertained during the presentence process. Following the November 16, 2018 hearing, the government produced no independent evidence during the trial or sentencing process that Mr. Dixon actually "resided" at Apartment K or that Mr. treated that apartment any differently than the numerous "similarly situated defendants" the Probation Officer refers to in its Objections response. It is the government's burden to prove up the enhancement, and

1  it is their job to adduce evidence that Dixon's statement was unquestionably false. The government
2  has not done so here.
3      Indeed, the Guidelines themselves caution against the imposition of this enhancement because
4  "it is not intended to punish a defendant for the exercise of a constitutional right…in applying this
5  provision in respect to alleged false testimony or statements by the defendant, the court should be
6  cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake or
7  faulty memory and thus, not all inaccurate testimony or statements necessarily reflect a willful
8  attempt to obstruct justice." *See id*., comment n. 2. This is exactly what the Probation Officer was
9  attempting to communicate to the Court in the Objections section; where one "resides" may mean
10 different things to different people, and accordingly there is no way the government could ever prove
11 that Mr. Dixon's declaration is false.
12     The government accordingly cannot prove by a preponderance of the evidence that Mr. Dixon's
13 declaration contained perjury or that his declaration was "materially false information." See U.S.S.G.
14 § 3C1.1, comment, n. 4.
15     Second, the statement was not material to anything of consequence in the case. An
16 enhancement under U.S.S.G. § 3C1.1 has a materiality component. *See* U.S.S.G. § 3C1.1, Comment
17 n. 6; *see also Garro*, 517 F.3d at 1171. To the extent the government contends that Mr. Dixon's
18 declaration contains a false statement, the Court would still need to conclude that such statement was
19 material to the proceedings. This Court has already stated, in a lengthy Court hearing, that any
20 statement made by Dixon as to his residence at the time of the search was totally immaterial to the
21 Court's order on the Motion to Suppress. *See* Docket 68 at 6-7. At that same hearing, the Court
22 stated as follows:

> The fact that it may be untrue whether he resided there or not – he said he didn't in the statement, but it may be a lie – that had no bearing on the motion to suppress. The truth of the matter doesn't have the bearing on the motion to suppress. It's what the police officers knew, what did they understand to be the case. That was the Court's ruling. As such, since your materiality is limited to that, I don't understand how you've even stated a case.

*Id*. at 6:2-10. Nothing has changed on this point since the November 16, 2018 hearing. Even
assuming the falsity of the statement, the statement was immaterial and inconsequential to

DEFENDANT'S SENTENCING MEMORANDUM
*DIXON*, CR 18–00319 CRB

proceedings at hand and the ultimate adjudication of the charges.  The government cannot meet its burden on this element of an obstruction enhancement either.

Finally, the record is devoid of Dixon's willful intent.  As this Court has repeatedly pointed out, Dixon's state of mind as to his residence was totally irrelevant to the Motion to Suppress.  Given the inherent fungibility of the word "reside" it would be virtually impossible to prove Dixon "willfully lied" in his declaration.  Reside is a term of art that means different things to different people, and it can be a fluid concept for individuals without significant economic means.  This is simply not a case where Dixon claimed the house was blue when in fact the house was red.  This type of statement is not easily subjected to an obstruction of justice enhancement; on the record now before the Court, the government has fallen far short of its burden.

In sum, the Court should follow the recommendation of Probation and decline to impose an acceptance of responsibility enhancement.  The Guideline range for the three misdemeanor convictions should be Offense Level 6, CHC VI, or 12-18 months in custody.

V. **THE COURT MAY TAKE JUDICIAL NOTICE OF THE MISDEMEANOR CONVICTIONS FOR THE PURPOSE OF ADJUDICATING THE FORM 12, BUT MR. DIXON OBJECTS TO THIS COURT MAKING ANY ADDITIONAL FACTUAL FINDINGS THAT DIXON COMMITTED A VIOLATION OF 21 U.S.C. § 841 ABSENT A JURY'S DETERMINATION BEYOND A REASONABLE DOUBT.**

Mr. Dixon has no objection to the Court taking judicial notice of the misdemeanor convictions in CR-18-319 CRB in order to resolve the Form 12 allegations in Case No. CR-13-328 CRB.  Such violations would constitute Grade C violations with a resulting Guideline range of 7-13 months.  On March 8, 2019, the Probation Department filed a Violation Memorandum in which the Probation Officer noted that the Court has not yet adjudicated the charges in the Form 12, nor has determined which grade of violation Dixon's conduct amounts to.

This Court should avoid appellate complications in pursuing additional factual findings as to the new law violations alleged in the Form 12 that were not found by a jury beyond a reasonable doubt.  Recently, on February 26, 2019, the United States Supreme Court heard argument in the case of *United States v. Haymond*, Case No. 17-1672, whereby the question presented was whether or not 18 U.S.C. § 3583(k) is constitutional in its provision for a 5 year mandatory minimum punishment

upon a judicial finding that a defendant on supervised release for several enumerated statutes involving minor victims has committed a new law violation.  During the oral argument, however, the justices of the Supreme Court appeared to steer the oral argument in the direction of whether or not supervised release violation hearings in general violate the constitution because a judge is allowed to impose custody time based upon a preponderance of the evidence finding.  *See* https://www.scotusblog.com/case-files/cases/united-states-v-haymond/ ("Several justices also questioned the government's contention that a jury was not required to find the facts leading to a conclusion that Haymond had violated the terms of his supervised release and the imposition of the new five-year sentence.")  According to at least one blogger, "only Justice Samuel Alito seemed to be squarely on the government's side, warning that a ruling for Haymond could potentially 'bring down the entire supervised release system.'"  *Id.*[6]

In anticipation of a possible defense-favorable ruling by the Supreme Court that "could bring down the entire supervised release system," Mr. Dixon now objects to this Court making any additional factual findings that could alter his violation status from a Grade C to a Grade A and preserves his arguments as to the potential implication of the *Haymond* ruling.  Because a jury did, in fact, find Dixon guilty of possession of three different narcotics, this Court can avoid the entire appellate mess involved in judicial fact finding on a Grade A violation and purely sentence Dixon on the Form 12 on the basis of the jury's convictions, and nothing else.  This is the prudent and most efficient course for this Court to take here.  As indicated above, the sentence Dixon urges is a mid-range, 9 month Guideline sentence for the violation conduct, to run consecutive to the 6 month advocated for the underlying offenses.

## CONCLUSION

For the aforementioned reasons, Mr. Dixon requests the Court to sentence him to 15 months in custody; 6 months on the underlying drug violations in CR-18-319 CRB; 9 months consecutive

---

[6] The 10th Circuit case is *United States v. Haymond*, 869 F.3d 1153 (10th Cir. 2017) *cert granted by United States v. Haymond*, 2018 U.S. LEXIS 6263 (U.S. Oct. 26 2018).

custody for CR-13-328 CRB; 1 year of supervised release to follow, and a $75 special assessment for the 3 Class A misdemeanor convictions.

Dated: March 12, 2018

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

         /S
ELIZABETH M. FALK
JULIANA DEVRIES
Assistant Federal Public Defenders